**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **ROSE PAGE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 09-0021-WS-M** |
| ) | |
| **WINN-DIXIE MONTGOMERY, INC.,** ) | |
| *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

**ORDER**

This matter comes before the Court on Defendants' Joint Motion for Summary Judgment (doc. 45) and Plaintiff's Motion for Partial Summary Judgment (doc. 47). Both Motions have been extensively briefed and are ripe for disposition.

**I.      Nature of the Action.**

Plaintiff, Rose Page, brought this action for race discrimination and retaliation under 42 U.S.C. § 1981 against her employer, Winn-Dixie Montgomery, Inc. ("Winn-Dixie"), as well as a § 1981 race discrimination claim against her former supervisor, Brent Sellers. The Complaint originates from an incident that occurred on December 20, 2006, at Winn-Dixie Store No. 578, a food supermarket in Mobile, Alabama. At that time, company officials discovered that approximately $1,000 was missing from the store safe. After investigation, Winn-Dixie took disciplinary action against two African-American employees, Page and Markale Jackson, by demoting them for failing to follow company cash-handling policies. Winn-Dixie took no comparable action against the store manager and co-manager, both of whom are white, despite Page's contention that they were equally culpable for this loss.

Both Page and Jackson (who are represented by the same counsel) filed federal lawsuits under § 1981 against Winn-Dixie, although Jackson's preceded Page's by a full year. This Court granted Winn-Dixie's motion for summary judgment in the *Jackson* matter less than two weeks before Page filed her Complaint. *See Jackson v. Winn-Dixie, Inc.*, 2008 WL 5435576 (S.D. Ala.

Dec. 31, 2008), *aff'd* 2009 WL 3792361 (11th Cir. Nov. 13, 2009).[1]  Although the record and

legal issues are not identical in the two cases, there is substantial overlap between Winn-Dixie's

motion for summary judgment in the *Jackson* matter and defendants' joint motion for summary

judgment here.  In large part, the parties' dueling Rule 56 motions in this case turn on the degree

to which the rulings in *Jackson* are applicable to Page.

**II.      Background Facts.**[2]

Notwithstanding the parties' verbose submissions (spanning more than 150 pages of

briefing in the aggregate), the relevant facts are largely undisputed and the relevant legal issues

are narrow.[3]

     **A.      *Management Structure and Page's Duties.***

During the time period in question, Page was employed at Winn-Dixie Store # 578 as the

In-Store Coordinator ("ISC").  (Page Dep., at 76-77.)[4]  According to a Winn-Dixie job

---

[1]      Plaintiff's filings in support of her Motion for Partial Summary Judgment contain citations to declarations and other record materials from the *Jackson* matter.  Yet plaintiff failed to append copies of certain of those exhibits to her summary judgment filings here.  The *Jackson* exhibits which Page has cited but which she has not included in her evidentiary materials pursuant to Local Rule 7.2(a) are not part of the record in this case.

[2]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, with respect to each motion for summary judgment, the nonmovant's evidence is taken as true and all justifiable inferences are drawn in that party's favor.

[3]      Before Rule 56 briefing commenced, this Court cautioned the parties that "[g]iven the straightforward, finite factual allegations and legal theories identified in the Complaint, it is unclear why this case would fall within the narrow class of circumstances" that might justify expansion of established page limits for briefs.  (Doc. 43, at 1.)  This admonition fell on deaf ears, inasmuch as both sides have engaged in excessive and repetitious treatment of narrowly circumscribed legal and factual issues.  The redundancies and irrelevancies that pockmark the parties' filings are unhelpful.

[4]      The Court's review of the record has been hampered by defendants' submission of five complete deposition transcripts (doc. 44, at Exhs. A-E), numbering hundreds of pages, and including numerous deposition exhibits, all in derogation of the Local Rules.  *See* LR 5.5(c) ("If discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response.").  This is not the first time that this Court

description, the ISC position includes the following duties: (i) to manage front end accounting and cash media reconciliation in compliance with applicable law and company procedures; (ii) to improve customers' experience by providing fast service, a friendly atmosphere, and successful resolution of customer concerns; and (iii) to lead, develop and supervise front end operations. (Page Dep., Exh. 8 at 1.) In the view of Irvin Landry, Winn-Dixie's decision-maker in this case, "[t]he ISC's primary purpose is to oversee and manage the money in the safe and to ensure that the accounting of the office is done in accordance with company policy." (Landry Decl., ¶ 10.)[5]

Of course, Page was not the only Winn-Dixie employee with a measure of responsibility for Store #578 as of December 2006. Among the relevant managerial personnel were the Store Manager, Brent Sellers, who oversaw day-to-day operations at Store #578. (Sellers Decl., ¶¶ 1-2.) Sellers reported directly to Landry, the District Manager, who oversaw operations of all stores located in the 4-4 District, including Store #578. (Landry Decl., ¶¶ 5-6.) On site, there was also a Co-Manager named Jeremy McPherson, who reported directly to Sellers and assisted him in overseeing daily operations at Store #578. (McPherson Decl., ¶ 2.) And Store #578 had an Assistant In-Store Coordinator ("AISC"), Markale Jackson, whose duties included performing safe counts and other cash-handling responsibilities. *See Jackson*, 2008 WL 5435576, at *1. Because this case is rooted in allegations of race discrimination, it bears noting that Landry, Sellers and McPherson are white, while Page and Jackson are African-American.

## B. *Winn-Dixie Cash-Handling Policies and Procedures.*

Like other Winn-Dixie locations, Store #578 has a store safe where money is secured. (Landry Decl., ¶ 7; Page Dep., at 103-05.) Among the items found in the safe at any given time

---

has alerted defense counsel to the provisions of Local Rule 5.5(c). *See Rowell v. Winn Dixie*, 2008 WL 4369003, *1 n.3 (S.D. Ala. Sept. 23, 2008) (pointing out Local Rule 5.5(c) requires that only relevant excerpts, and not entire deposition transcripts, be filed). "[T]his Court will not scour uncited portions of the parties' evidentiary submissions for any scrap of evidence that may advance their positions. ... Instead, review of the parties' submissions is restricted to the portions of the record they have cited ...." *Id.* (citations omitted).

[5]     This formulation of the ISC role is echoed by Leanda Black, who replaced Page as ISC at Store #578 in January 2007 following the transfer decision that is the subject of this litigation. (Black Decl., ¶ 2.) Black explains that, "[a]s ISC [her] primary responsibility is to oversee and manage the money in the office." (*Id.*, ¶ 3.)

are bundles of U.S. currency, sorted by denomination of the bills, with each bundle bound by a strap on which the aggregate value of the currency is written.  (Landry Decl., ¶ 8.)

The parties agree that, during the relevant time frame, Winn-Dixie's cash-handling policies provided that certain money-counting procedures must be followed every morning at store opening, every evening at store closing, and whenever the safe key is transferred from morning ISC to evening ISC at shift change.  (Doc. 48, at 2 ¶ 5; doc. 52, at 3.)  These company procedures required that, on each specified occasion, the money in the safe must be counted, its contents recorded in writing, and the tallied amount reconciled with the store's office cash report.  (Doc. 48, at 2 ¶ 5; doc. 52, at 3.)  Thus, when the store opened each day, the morning ISC (who may be either the ISC or the AISC) counted the money in the safe, recorded the tally on a safe count sheet, and confirmed that the count was consistent with that reported for the previous day's store closing.  (Page Dep., at 80, 108; Landry Decl., ¶ 11.)  Then the manager on duty (who was present in the office when the morning ISC opened the safe and counted the money) also counted the money for verification purposes, and recorded that information on the safe count sheet.  (Page Dep., at 108-09; Landry Decl., ¶ 11.)  The money was then placed back in the safe, after which the safe was locked with a key.  (Page Dep., at 110; Landry Decl., ¶ 12.)[6] The morning ISC retained that key until the conclusion of his or her shift.  (Landry Decl., ¶ 12.)[7] At Store #578, Page typically worked the morning shift as of December 2006, and performed these morning ISC functions, with Jeremy McPherson (the Co-Manager) often being the manager on duty who verified the safe count.  (Page Dep., at 99, 102-03.)[8]

The Winn-Dixie policy of paramount importance in this case involves the procedure for

[6]    There was only one key to the safe at Store #578.  (Sellers Decl., ¶ 6.)  The manager on duty at Store #578 never held the safe key when the store was open; rather, that item remained in the custody of the ISC on duty.  (*Id.*, ¶¶ 6-7.)

[7]    As Landry put it, "once that count is complete, the key to the safe is given to the ISE [*sic*] and she or he is totally responsible and held accountable.  That is the purpose of the ISE [*sic*]."  (Landry Dep., at 94.)

[8]    Typically, Markale Jackson would work the later shift and serve as the evening ISC, such that he would perform the safe count with the manager on duty when the store closed at night.  (Page Dep., at 100-01.)  At shift change, safe count would ordinarily be performed by the morning ISC (Page) and the evening ISC (Jackson), without participation by a manager.

counting the safe's contents.  It is undisputed that, as of December 2006, Winn-Dixie cash-handling policies required that each time the money in the safe was counted, all bundles of cash (with the exception of the bundles of $1 bills) must be broken open, recounted, and restrapped.  (Landry Decl., ¶ 9; Landry Dep., at 62-63.)[9]  This policy applied equally to the morning ISC who performed the initial count and to the manager on duty who verified that count.  (Landry Dep., at 62-63.)  It also applied to both ISCs who counted the safe at shift change.

With respect to these cash-handling policies, plaintiff relies heavily on four pages of written materials produced by Winn-Dixie in discovery, in the form of a two-page excerpt from a "Front End Reference Guide" (the "Front End Guide") dated 1/13/06 and another two-page document entitled "Store Director How-To Guide Cash Office Roles, Responsibilities, and Processes" (the "How-To Guide").  (Doc. 48-1, at 11-14.)  The Front End Guide stated that keeping the store safe secure "is the responsibility of the Store Director, Store Co-Manager, and ISC."  (Doc. 48-1, at 1.)  The Front End Guide also recited the following features of safe counts, as discussed *supra*: (a) safe counts must be performed every time the store opens or closes, or when the safe key is transferred between employees at shift change; (b) double verification is required for safe counts; (c) the manager on duty must be present during safe counts at opening and closing; and (d) "[s]trapped money must be broken, counted, verified, dated, and initialed."  (Doc. 48-1, at 2.)  The How-To Guide reinforced these points by providing that managers on duty are "accountable for verifying key cash office processes" such as "opening and closing safe counts."  (Doc. 48-1, at 3.)  According to the How-To Guide, "the [Manager on Duty] is responsible for verifying all opening and closing safe counts."  (Doc. 48-1, at 4.)[10]

_____

[9]     These bundles of cash did not remain in the safe at Store #578 for a protracted period of time.  According to Page, money was rotated out at least once a week, such that bundles would not generally be kept on site for more than a week.  (Page Dep., at 117-18, 221.)

[10]     Of course, the mere fact that these documents exist does not prove that the relevant Winn-Dixie managers were familiar with them, or that Page's discipline was motivated by or connected to those documents.  The evidence in the record is otherwise.  Store Manager Brent Sellers indicated that he had never seen the pages from the How-To Guide prior to this litigation.  (Sellers Decl., ¶ 19; Sellers Dep., at 19.)  As for the Front End Guide, Sellers testified that this document was part of a "binder which is available for employees to use if they have a question about Front End operations."  (Sellers Decl., ¶ 19.)  Sellers testified that he is familiar

## C. The Cash Shortage and Ensuing Investigation.

The morning of December 20, 2006 began unremarkably at Store #578.[11] Page (the morning ISC) and McPherson (the manager on duty) reported for work as usual and performed a count of the store safe's contents at approximately 6:00 a.m., with Page conducting the initial count and McPherson verifying it. (Page Dep., at 118-19, 121; McPherson Decl., ¶ 6.) Both individuals filled out and signed a "Safe Count Sheet" documenting the cash on hand. (Page Dep., at 119 & Exh. 10; McPherson Decl., ¶ 6.) Per their routine practice, the safe was locked after the count was completed and Page held the only key in her possession for her entire shift. (Page Dep., at 121; McPherson Decl., ¶ 6.) At approximately 2:00 p.m., Jackson (the evening ISC) arrived for shift change. (Page Dep., at 121-23; McPherson Decl., ¶ 6.) Page and Jackson performed another safe count and filled out another Safe Count Sheet. (Page Dep., at 122-23 & Exh. 11.) Upon completing the count and locking the safe, Page gave the safe key to Jackson and left work for the day. (Page Dep., at 124.)

Later that afternoon, a problem was discovered. Jackson notified McPherson that he had broken open one of the bundles in the safe to make change for a cashier, only to discover that the bundle was missing $125. (McPherson Decl., ¶ 10.) McPherson and Jackson then checked the other bundles and found a total cash shortage of approximately $1,000. (*Id.*) McPherson reported the discrepancy to Landry, the District Manager, the next morning. (*Id.*, ¶ 11; Landry Dep., at 69-70.)[12] Landry promptly sent a team of investigators to Store #578 to investigate the

---

with that binder, but that he is "not familiar with its contents." (Sellers Dep., at 16.) Similarly, McPherson's uncontroverted averment is that he is not aware of, and has not seen, the How-To Guide, and that he has neither reviewed nor used the Front End Guide. (McPherson Decl., ¶¶ 17-18.) And Landry indicated that the How-To Guide was "not something that I would personally go through or have to view," such that he could not shed any light on that document or state whether store managers were ever given or ever reviewed it. (Landry Dep., at 56-57, 68.)

[11]     At that time, Sellers was "frequently absent from the store because of a medical condition." (McPherson Decl., ¶ 13.) In fact, Sellers was on a medical leave of absence from October 2006 through April 2007, such that he "was not regularly at the store" during the relevant time period. (Sellers Decl., ¶ 8.)

[12]     Sellers learned of the cash shortage when someone from the store contacted him with that information. (Sellers Decl., ¶ 8.) It is apparent that he was not actually working on the

disappearance of the funds.  (Landry Dep., at 71-72.)  At the conclusion of their on-site inquiry, the investigators notified Landry that the money was indeed missing and that proper procedures had not been followed at the shift change safe count on December 20.  (*Id.* at 73.)  Landry never was able to determine when the loss occurred.  (*Id.* at 114.)  In Landry's view, the "problem" was that company policy had not been followed at shift change, as a result of which it was impossible to determine when the money went missing.  (*Id.* at 76.)

More specifically, Landry found that the morning ISC and evening ISC had not counted and verified all the money in the safe at shift change on December 20.  (Landry Dep., at 113.) Landry's view was that this omission was the root cause of the $1,000 cash shortage.  (*Id.*) Simply put, in performing the December 20 shift change count, neither Page nor Jackson had adhered to the requirement that bundled cash be recounted and restrapped during every safe count.  Instead, they had simply accepted as valid the numbers written on the straps for each bundle, assuming rather than verifying those values.  Because of that omission, there was no way of ascertaining whether the shift change count and verification that Page and Jackson performed on December 20 was accurate, or when the funds had disappeared from the safe.

In early January 2007, Landry went to Store #578 and met with Page.  (Page Dep., at 134; Landry Decl., ¶ 18.)  Sellers, the Store Manager, was also present; however, he was there solely as a witness, and did not speak during the meeting.  (Landry Decl., ¶ 18; Sellers Dep., at 27-28.)[13]  According to Page, Landry accused her of not doing her job, in response to which she insisted that she did do her job and that "we all didn't follow company policy because we didn't verify the money."  (Page Dep., at 135, 137.)  Page contends that she asked Landry about McPherson's role, implying that he was blameworthy as well, but that Landry refused to discuss McPherson (who was not present at the meeting) with her.  (*Id.*)  The salient part of this meeting, from Landry's perspective, was that he and Page "discussed the counting of the safe, verifying the bundles, and she admitted that she knew policy and procedure, and that she was not

---

day when the loss was discovered.

[13]     In that regard, Page confirmed that Sellers "sitting right there, did not say anything" during the meeting.  (Page Dep., at 135.)

following policy and procedure." (Landry Dep., at 102.)[14]

There is abundant, undisputed record evidence that Page knowingly violated Winn-Dixie cash-handling procedures by not breaking open and recounting the bundles at every safe count. By her own reckoning, Page was trained when she was still an assistant head cashier (in 2003 or earlier) that bundles of cash were always to be recounted during safe counts. (Page Dep., at 74-77.) Page admitted that, after she became the ISC for Store #578, she understood that during all safe counts, she was supposed to break open the straps, count the bundled cash, and restrap the bundles. (*Id.* at 83.) Page expressly understood that this Winn-Dixie policy applied to shift change safe counts. (*Id.* at 115.) In light of these facts, Page freely acknowledges that she and Jackson violated company policy at shift change on December 20 by not breaking open the bundles and counting the money, such that the safe count's accuracy was compromised. (*Id.* at 222.)

### D.    *Winn-Dixie's Challenged Personnel Decisions.*

Following his meeting with Page in January 2007, Landry decided to remove her from her position as ISC at Store #578 and to transfer her to another store. (Landry Decl., ¶ 21.) As a result, Page was placed in Store #549 as a full-time cashier, a position she continues to hold today. (Page Dep., at 142-44.) This was clearly a demotion, and was accompanied by a sizeable reduction in Page's hourly wage. (*Id.* at 145, 169.) Landry also demoted Jackson (the evening ISC involved in the shift change count on December 20) to the position of Grocery Store Associate. (Landry Decl., ¶ 21.) It is uncontroverted that Landry made these personnel decisions as to Page and Jackson, and that Sellers neither made those decisions nor had the authority to do so. (*Id.*; Sellers Decl., ¶¶ 9-10.) Landry did not demote or penalize Sellers or McPherson for their roles in the cash shortage, although both received verbal counseling. (Landry Dep., at 83, 88-89; Sellers Dep., at 32; doc. 48-3, at 6.)[15]

---

[14]    As Landry stated, "Ms. Page admitted to me that proper cash-handling procedures were not followed on December 20th (the day the shortage was discovered) when she and AISC Jackson counted the safe around 2:00 p.m." (Landry Decl., ¶ 19.)

[15]    When Landry learned that Sellers had not followed company policy when counting the safe, he counseled Sellers but did not otherwise discipline him. (Landry Dep., at 83, 88-89.) This counseling session consisted of Landry telling Sellers that he "needed to make

Page maintains that her demotion was unfair because "we all didn't follow company policy. ... We all should have been accountable for that missing money." (Page Dep., at 146.)[16] The "we all" reference encompasses all Store #578 employees involved in safe counts. Indeed, Page testified that no Winn-Dixie employees involved in counting money at Store #578 were breaking down the bundles as of December 2006, such that all ISCs and managers at that location who participated in safe counts were equally in violation of the same policy. (*Id.* at 156-60, 168.) There is support in the record for the proposition that Store #578 employees were engaged in wholesale noncompliance with company policies concerning the counting of bundled cash during safe counts in the relevant time period.[17] Page asserts that she informed Landry of these widespread, store-wide violations during their January 2007 meeting. (Page Dep., at 162-63.) Thus, in the light most favorable to plaintiff, the record shows that Page told Landry that "we all didn't follow company policy" with regard to counting strapped and bundled cash during safe counts, such that managers on duty and other rank-and-file employees were likewise violating that policy. It is uncontroverted that, aside from his actions taken against Page and Jackson, Landry "did not transfer any of the other office associates at Store No. 578 from their positions either. Some of these employees are black and some of these employees are white." (Landry Decl., ¶ 29.)[18] This purported disparate treatment of violators of this policy lies at the

_____

sure that the store's employees were complying with all cash handling procedures." (Sellers Decl., ¶ 15; Sellers Dep., at 111.)

[16] This theme is a recurring one in the record, such as where Page testified that, "just like the rest of them, they was -- they should have been demoted or something should have been -- they should have been -- the[y] violated company policy just like I violated company policy." (Page Dep., at 219.)

[17] In the *Jackson* action, Sellers testified that it had essentially become "customary procedure" at Store #578 not to count strapped cash during safe counts. (Doc. 48-2, at 5, 7.) Also in that case, McPherson agreed that it was a "commonly accepted practice" at Store #578 not to break down the bundled cash during safe counts. (Doc. 48-3, at 3.)

[18] For example, Page's testimony is that the Store #578 employees who performed safe counts and routinely failed to count bundled cash included Leanda Black and Wanda Lafayette, both of whom are African-American. (Page Dep., at 37, 125, 160-61.) According to Page, Black was performing cash counts in December 2006, because her signature was on the strapped bundles of cash in the safe on December 20. (*Id.* at 220-21.) Page testified that she

heart of Page's claims in this action.

For his part, Landry explained his personnel decisions on the record. He reasoned that, in his view, Page and Jackson were "primarily responsible for the loss because they had failed to follow Winn-Dixie's cash handling procedures, which was one of their primary job duties as ISC and AISC," because they were the only key-holders for the safe on the day the cash shortage was discovered, and because they had received training in proper cash-handling procedures. (Landry Decl., ¶ 22.) Landry echoed these points in his deposition, testifying that he decided to demote Page because "she didn't follow policy and procedure, her job responsibility." (Landry Dep., at 91.) Landry testified that one of the primary duties of an ISC is to oversee the cash office and to implement policies and procedures associated with that function. (*Id.* at 114.) And because Page and Jackson did not follow "that policy and procedure, is the reason [Landry] acted because we ended up with a $1,000 shortage." (*Id.* at 113.) Landry also differentiated between the shortcomings of Jackson and Page, on the one hand, and those of managers on duty, such as McPherson or Sellers, on the other. In Landry's view, when a manager on duty fails to perform the count in accordance with Winn-Dixie policy, the proper recourse is counseling, not demotion, because the ISC bears a heightened level of responsibility and accountability for the safe that managers do not. (*Id.* at 91-93.) According to Landry, Page (as morning ISC) "was totally responsible for the office" and the manager on duty's verification of the morning count essentially transferred accountability of the funds in the safe to Page for the duration of her shift. (*Id.* at 97.)

_____

informed Landry that numerous employees at Store #587 (including Black, Lafayette, Sellers, McPherson and others) did not follow company policy concerning the breaking down of bundles in safe counts. (*Id.* at 162-63.) Neither Black nor Lafayette was transferred or demoted after the December 20 cash shortage incident. (*Id.* at 160-61.) Moreover, in her initial statement to the EEOC, Page complained that she had been on vacation from December 16 through December 18, "and I would like to know why didn't the persons, who work my shift on that day get in trouble. Because Leanda Black work mornings sometimes and also Wanda whenever I take off." (Page Dep., at 200 & Exh. 15 at 1.) Thus, Page staked herself to a position that Black and/or Lafayette had performed morning safe counts on December 16, 17 and 18, and that they too should have been disciplined when the cash shortage came to light on December 20. Black confirmed that she performed opening and/or closing safe counts on days when Page was not working. (Black Dep., at 10-11.)

Landry also offered specific explanations for why Sellers and McPherson were not subjected to disciplinary action more onerous than counseling as a result of the December 20 cash shortage. Indeed, Landry stated that he did not hold Sellers "primarily responsible for the incident" because Sellers "was on medical leave from sometime in October 2006 until April 2007," such that Sellers "was not present in the store when the $1,000 was reported missing." (Landry Decl., ¶ 27.) These facts are corroborated in the record. Sellers was not "regularly" at work in December 2006 because of his medical leave, and was "frequently absent" during that time. (Sellers Decl., ¶ 8; McPherson Decl., ¶ 13.) He was not present at Store #578 on the day that the Winn-Dixie team arrived to investigate the cash shortage, which would have been December 21, 2006. (Sellers Dep., at 30.)[19] For her part, Page does not recall ever performing safe counts with Sellers in December 2006. (Page Dep., at 129.) During that period, Page understood that Sellers was on medical leave, as a result of which he was "in and out" of the store. (*Id.* at 129.) Sellers never opened the store during October 2006 to April 2007 period. (Doc. 48-3, at 5.) According to Page, the only times that she counted the safe with Sellers occurred "before he got sick," or prior to October 2006. (Page Dep., at 157.)

Landry also elaborated on his reasons for not disciplining McPherson. They are twofold. First, Landry indicated that McPherson was not "primarily responsible" for the December 20 cash shortage "because overseeing the safe was not the managers' primary duty," such there were differences in type and level of responsibility for the safe as between the ISC/AISC, on the one hand, and the co-manager, on the other. (Landry Decl., ¶ 28.) Landry also exempted McPherson from more serious discipline based on his understanding that McPherson had not attended formal training on cash-handling procedures. (*Id.*) In fact, the record is clear that McPherson had received no such training, and did not know about the company policy requiring the unbundling and recounting of strapped cash during safe counts. McPherson did not count the bundles when he verified Page's figures at the opening safe count on December 20 "because that was the customary way of doing things" at Store #578. (Doc. 48-2, at 7.) His unrebutted

---

[19] This fact, coupled with his absence on December 20, implies that Sellers was out the entire week of the cash shortage discovery, because he would "have chemo every two weeks, and I'd work a week and I'd be off a week." (*Id.*)

testimony is that, as of December 20, 2006, he "did not know that it was required under company policy to count the money inside the bundles rather than just add up the value stated on the straps," that he had received neither training nor instruction in that procedure, and that consequently he "did not count the bundles either." (McPherson Decl., ¶¶ 8, 16.) The record shows that the only training McPherson received on cash-handling policies was "[o]n-the-job training" and that Winn-Dixie provided "no formal training for cash handling" for a person in McPherson's job title. (Landry Dep., at 45, 115-16.) In fact, McPherson had been verifying safe counts without unstrapping bundled cash during the entire time that he was in management, operating under four different store directors, without ever being told that he was not following the proper procedure. (Doc. 48-3, at 2-3, 6.)

## III.   Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation

and intent.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  *Id.* at 1086 (citation omitted).

Furthermore, "[t]he applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment."  *Murray v. Holiday Isle, LLC*, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (citations omitted); *see also Godard v. Alabama Pilot, Inc.*, 485 F. Supp.2d 1284, 1291 (S.D. Ala. 2007) (same).  Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits").  Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts."  *Murray*, 620 F. Supp.2d at 1307 (citations omitted); *see also Godard*, 485 F. Supp.2d at 1291.

**IV.    Analysis.**

> **A.    *The* McDonnell Douglas *Framework.***

Although Page's race discrimination and retaliation claims are brought pursuant to 42 U.S.C. § 1981, it is well established that § 1981 claims are governed by the same analytical framework and requirements of proof as their Title VII counterparts.[20]  Therefore, as the parties properly acknowledge, their respective summary judgment arguments on Page's discrimination and retaliation claims are properly evaluated under the time-honored *McDonnell Douglas*

---

[20]        *See, e.g., Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008) (reciting identical standards for Title VII and § 1981 claims of discrimination); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (reciting identical standards for retaliation claims under Title VII and § 1981); *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 n.1 (11th Cir. 2007) ("Both Title VII and § 1981 have the same requirements of proof and present the same analytical framework.") (citation omitted).

standard. Absent direct evidence of discrimination or retaliation (which has not been presented here), Page must make a showing of circumstantial evidence that satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race discrimination and/or retaliation.[21] If she does so, that showing "creates a rebuttable presumption that the employer acted illegally." *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).

At that point, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. ... If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (outlining similar procedure for Title VII retaliation claims). A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted). Either way, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. ... Quarreling with that reason is not sufficient." *Wilson*, 376 F.3d at 1088; *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for his demotion was pretexual."). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007). Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of

---

[21] Page's burden of establishing a *prima facie* case is not heavy. *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (*en banc*).

### B.      *Race Discrimination Claim against Winn-Dixie.*

#### 1.      *Plaintiff's* Prima Facie *Case.*

The parties agree that the elements Page must show to establish a *prima facie* case of race discrimination based on her demotion and transfer consist of the following: (i) she belongs to a racial minority; (ii) she was subjected to an adverse job action; (iii) Winn-Dixie treated similarly situated employees outside her protected class more favorably than she was treated; and (iv) she was qualified to do the job. *See, e.g., Crawford*, 529 F.3d at 970; *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). Winn-Dixie does not contest Page's ability to establish the first, second or fourth prongs of that test, but does challenge her ability to satisfy the third element.[22]

The only comparators that Page has identified are Sellers and McPherson. (Doc. 53, at 4 & 5 n.3.) The record shows that McPherson violated the same cash-handling policy for which Page was disciplined on December 20, 2006, inasmuch as he failed to unstrap and recount bundled cash during the morning safe count. Likewise, the record shows that Sellers, the store manager, had routinely failed to count the bundles when he participated in safe counts at Store #578. Winn-Dixie insists that Sellers and McPherson are not similarly situated to Page because Sellers' misconduct was not connected to the cash shortage, McPherson had no training in and no knowledge of the bundle-counting rule, and Page's responsibility for the funds was

---

[22]      Importantly, "[a] plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably. *McDonnell Douglas* requires the plaintiff to establish a *prima facie* case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class." *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005). The applicable legal standard for the "similarly situated" element is as follows: "Where the racial discrimination is alleged in the application of work rules to discipline an employee, and where there is no claim that the employee did not violate the work rules, as here, then plaintiff must show that he engaged in misconduct similar to that of a person outside the protected class, and ... the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Rioux*, 520 F.3d at 1276 (internal quotes omitted). To satisfy this threshold, "[t]he quantity and quality of the comparator's misconduct [must] be nearly identical" to that of the plaintiff. *Id.* at 280 (internal quotes omitted).

significantly different than that of Sellers and McPherson because of their differing job titles.

In advancing this "similarly situated" argument, Winn-Dixie ignores this Court's unfavorable analysis of this same issue under factually indistinguishable circumstances in the *Jackson* case. Recall that Markele Jackson was the AISC who participated in the shift change safe count with Page on December 20. Like Page, Jackson did not follow the bundle-counting protocol, and was subsequently demoted. In his race discrimination action against Winn-Dixie, Jackson likewise identified Sellers and McPherson as comparators, and Winn-Dixie proffered many of the same arguments that it does here for why those individuals did not qualify as "similarly situated" for purposes of the plaintiff's *prima facie* case. Relying on the Eleventh Circuit's pronouncement that "[t]he relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies," *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 793 (11ᵗʰ Cir. 1999), this Court in *Jackson* rejected Winn-Dixie's argument that the differing job titles and duties of Jackson and the proposed comparators prevented Jackson from satisfying the "similarly situated" prong of the *prima facie* analysis. The Court reasoned, "[w]hile their responsibilities were not identical, both the plaintiff and his comparators were subject to the same employment policy that bundles must be broken open and counted with each safe count." *Jackson*, 2008 WL 5435576, at *7. The same holds true here. Winn-Dixie has not even attempted to rebut or distinguish this Court's ruling in *Jackson* on this point. Accordingly, the mere fact of Sellers' and McPherson's differing duties and titles from those of Page in no way precludes them from being valid comparators, in light of plaintiff's showing that she, Sellers and McPherson were all subject to (and all in violation of) the very same company policy.

The *Jackson* decision likewise addressed Winn-Dixie's contention that Sellers is not a proper comparator because his violation of cash handling policies did not result in a monetary loss, whereas the plaintiff's did. This Court wrote in *Jackson* that it could not accept this argument in the absence of supporting authority or legal analysis because "[w]hat the Court is to compare is 'misconduct,' not 'the consequences of misconduct,' as monetary loss from lax cash-handling procedures would appear to be." *Jackson*, 2008 WL 5435576, at *7. Winn-Dixie has not remedied the deficiencies in this argument in the case at bar, nor has it even acknowledged

this aspect of the *Jackson* decision.[23]  On this record and with these briefs, then, the Court cannot agree with Winn-Dixie that Sellers is not similarly situated to Page for purposes of her *prima facie* case of discrimination.

Defendant's only new "similarly situated" argument that was not addressed in *Jackson* is that McPherson is not a viable comparator because he had not received formal training in cash-handling procedures, whereas Page had.  The only authority that Winn-Dixie cites for this proposition is an unpublished Eleventh Circuit decision, *Mathis v. Wachovia Bank*, 2007 WL 3357732 (11th Cir. Nov. 14, 2007).  In *Mathis*, the panel found that a proposed comparator was not similarly situated to the plaintiff, where the comparator was a new hire who had been with the company for "only a short time," while the plaintiff had worked there for three years.  *Id.* at *5.  The *Mathis* court reasoned that "[b]ecause of this relevant difference in experience, [the plaintiff] and [the comparator] were not similarly situated."  *Id.*  In this case, however, Page and McPherson were both experienced Winn-Dixie employees who had engaged in safe-counting (Page) and safe-verification (McPherson) duties for an extended period of time.  Both Page and McPherson were subject to the same work rule.  And both Page and McPherson violated that rule by failing to count the bundles.  Based on these record facts, the Court cannot agree with Winn-Dixie that McPherson was not similarly situated to Page for purposes of satisfying her light burden of establishing a *prima facie* case.

For all of these reasons, Page has come forward with sufficient evidence that McPherson and Sellers were similarly situated to her to satisfy that element of the *prima facie* test.

---

[23]      At most, Winn-Dixie points to an unpublished district court opinion wherein the plaintiff's proposed comparator was deemed not similarly situated to the plaintiff because the comparator's "alleged violation did not result in a cash loss" while the plaintiff's did.  *Key v. Advance Auto Stores Co.*, 2005 WL 1026062, *4 (M.D. Fla. Apr. 25, 2005).  In citing *Key*, however, Winn-Dixie overlooks a critical fact in that case, namely that the applicable policy provided that a "violation of a cash handling policy ***that results in a cash loss*** is grounds for immediate termination."  2005 WL 1026062, at *4 (emphasis added).  A cash-handling violation in *Key* was a ground for immediate termination only if that violation resulted in a cash loss; therefore, the absence of a cash loss by the proposed *Key* comparator was a critical distinction.  Here, by contrast, Winn-Dixie's policies did not impose such a cash loss prerequisite before any particular disciplinary action could be taken.  *Key* is plainly distinguishable on its face, and does not support the more general, broad reading advocated by Winn-Dixie.

Inasmuch as there is no dispute that Page can establish the other three prongs, the Court finds that plaintiff has made out a *prima facie* case of race discrimination in connection with her demotion and transfer in January 2007.

        2.      *Legitimate Nondiscriminatory Reason.*

Plaintiff having established a *prima facie* case, the burden shifts to Winn-Dixie to "offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption" of race discrimination. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998); *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) ("To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.") (citations omitted). This burden of production is exceedingly light. *See Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769-70 (11th Cir. 2005) (burden is satisfied as long as employer articulates clear and reasonably specific non-discriminatory basis for its actions).

To meet this intermediate burden, Winn-Dixie presents argument and evidence that it "made the decision to demote plaintiff because she failed to follow Winn-Dixie's cash handling procedures, which was one of her primary job duties." (Doc. 46, at 28.) In the companion litigation in *Jackson*, this Court found that a similar explanation proffered by Winn-Dixie for demoting Markele Jackson after the December 20 cash shortage was "on its face a legally sufficient reason for its action," and that the record contained "admissible evidence that this is what actually motivated its decision." *Jackson*, 2008 WL 5435576, at *8. The same conclusions attach here, and plaintiff does not assert otherwise. Accordingly, the Court readily concludes that Winn-Dixie has met its burden of production in coming forward with a legitimate nondiscriminatory reason for the challenged demotion/transfer of Page. *See Jackson v. Winn Dixie, Inc.*, 2009 WL 3792361, *2 (11th Cir. Nov. 13, 2009) ("*Jackson II*") ("We conclude from the record that Jackson's failure to follow established cash-handling procedures was a legitimate, non-discriminatory reason for his job transfer, and it would reasonably motivate an employer to transfer him to a position in which he does not exercise monetary oversight.").

        3.      *Pretext.*

Winn-Dixie having come forward with a legitimate nondiscriminatory reason for the

challenged action, it is incumbent on Page to show that this stated reason is a pretext for race discrimination. *See Brown v. Alabama Dep't of Transp.*, --- F.3d ----, 2010 WL 605582, *7 (11th Cir. Feb. 23, 2010) (once employer articulates reason, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason ... is a pretext for illegal discrimination") (citation omitted). To demonstrate pretext, the plaintiff's evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels*, 408 F.3d at 771 (quotation omitted).[24]

Plaintiff's pretext argument hinges exclusively on the fact that Sellers and McPherson were not subjected to disciplinary action comparable to that imposed on Page. She reasons that, "[i]f plaintiff's violation of defendant's cash handling procedures were the true reason for her demotion and transfer, then Sellers and McPherson would also have been demoted and transferred." (Doc. 53, at 8.)[25] This pretext theory is substantively identical to that proffered by the plaintiff in the *Jackson* matter. Indeed, Jackson asserted that the failure to discipline Sellers and McPherson for their violation of cash-handling procedures demonstrated that Winn-Dixie's reliance on his violation of those policies as its reason for demoting him was pretextual. The Eleventh Circuit was not impressed by this argument, and laid bare its flaws as follows:

"Although Winn-Dixie decided not to punish similarly two white employees who

---

[24] *See also Rioux*, 520 F.3d at 1278 ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."); *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (to demonstrate pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

[25] Elsewhere, plaintiff frames this argument in the following terms: "[T]here can be no legally justifiable reason to support defendant's action against plaintiff without similar action against Sellers and McPherson. Company policy dictates that plaintiff, her store director, and her store co-manager were all responsible for the security of the store safe ...; in the instance of any failure of store safe security, it stands to reason that all three would suffer equivalent measures of discipline for equivalent neglect of job duties." (Doc. 48, at 10.)

violated the same procedures, their conduct was appreciably different from Jackson's, because: (i) one comparator [Sellers] was not present in the store for the months before and after the monetary loss, and no evidence indicates he was in any way connected to it; and (ii) unlike Jackson, the other comparator [McPherson] had not been trained in the procedures, and his violations were unwitting. Winn-Dixie's decision not to transfer the white employees did not establish that its stated reason for transferring Jackson was false or that the true reason for doing so was racially discriminatory."

*Jackson II*, 2009 WL 3792361, at *2.

In light of the Eleventh Circuit's rejection in *Jackson II* of the same pretext argument that Page advances, she cannot survive summary judgment unless she distinguishes her circumstances from those of Markele Jackson, or otherwise offers some basis why the Sellers/McPherson argument resonates differently with respect to Page than it did with respect to Jackson. Plaintiff recognizes this obstacle, and seeks to differentiate this case from *Jackson II* by relying on three pieces of evidence that she contends were "either not utilized or unavailable" during the companion case. (Doc. 59-1, at 1.) The implications of each of these items for the *Jackson II* pretext analysis will be considered in turn.

First, Page ascribes considerable weight to the terms of the Front End Guide and How-To Guide, including language specifying that the security of the safe "is the responsibility of the Store Director, Store Co-Manager, and ISC" and language that the manager on duty is "accountable for verifying key cash office processes," such as "opening and closing safe counts." (Doc. 53, at 8, 14-15; doc. 59-1, at 2, 8-9.)[26] Plaintiff extrapolates from the first provision that Winn-Dixie policy is that the store manager, co-manager and ISC bear <u>equal</u> responsibility for any cash shortage, such that they must receive equal discipline for any cash-handling violation. But the cited pages of the Guides do not state that all three actors' responsibility and accountability for cash-handling procedures is identical, and the uncontroverted evidence in the record is that Winn-Dixie did not place store managers, co-

---

[26] In her sur-reply, plaintiff incorrectly states "that the Defendants make <u>no mention</u> of the company's 'Store Director How-To Guide' in their Reply - NOT ONE REFERENCE ...." (Doc. 59-1, at 3 n.2 (emphasis in original).) Page 9 of defendants' reply explicitly addresses and responds to plaintiff's arguments concerning pages 362 and 364 of what Page calls the How-To Guide. (Doc. 55, at 9.)

managers, and ISCs on equal footing with regard to cash-handling violations.[27]  Likewise, although the How-To Guide posits that a manager on duty is accountable for verifying safe counts, that statement cannot reasonably be viewed as equating the manager on duty's verification responsibility with the ISC's primary counting responsibility, much less mandating that both be punished equally in the event of noncompliance.

More fundamentally, Page has failed to show that the Front End Guide or How-To Guide had any bearing on the discipline imposed in this case.  The undisputed evidence is that the decision-maker (Landry) had never reviewed those Guides, and could not shed any light on their contents.[28]  If Landry was not relying on those Guides in disciplining Page (which he plainly was not), then plaintiff's insistence that those Guides required Landry to discipline Sellers and McPherson equally is a *non sequitur*.  Simply put, there is no evidence that Landry ever consulted, relied on or considered the Front End Guide or How-To Guide in any way in meting out discipline to anyone.  Nor is there any evidence that he was required to do so, or that those Guides represented binding statements of policy at Winn-Dixie.  Hence, the four pages from the How-To Guide and Front End Guide on which Page relies do not raise an inference that Winn-Dixie's stated reasons for disciplining her were a pretext for race discrimination.[29]

---

[27]       For example, Landry testified that an ISC's "primary purpose" is to oversee and manage the money in the safe, whereas that is not the store manager or co-manager's primary role.  Thus, Landry identified gradations of responsibility for the safe among the ISC, the store manager, and the co-manager.  This stance is in no way inconsistent with the Front  End Guide and How-To Guide pages.  To state that security of the safe is the responsibility of the store manager, co-manager and ISC is not to state that all three bear equal accountability in the event that safe security is compromised.  Plaintiff's argument therefore reads more into the excerpts of the Guides than their plain language can support.

[28]       Similarly, Sellers and McPherson testified that they were unfamiliar with the contents of these exhibits and had never seen them before this litigation.  The uncontroverted evidence is that the How-To Guide and Front End Guide were musty documents sitting on office shelves that Winn-Dixie managers did not consult in performing their job functions.

[29]       A final point about the Guide pages is that they do not present any material facts that were not considered in *Jackson*.  After all, the record in *Jackson* was clear that Sellers and McPherson bore some measure of responsibility for cash-handling procedures at Store #578, inasmuch as they verified safe counts and engaged in other activities to verify certain office cash processes.  In that regard, the Guide pages are not substantially new and different evidence, and

Second, plaintiff would distinguish this case from *Jackson* by citing Landry's testimony as evidence that there is no divergence in training between McPherson and Page that might justify the differences in their discipline for the cash shortage. The Eleventh Circuit noted in *Jackson II* that, while Markele Jackson's violation of the bundle-counting rule was knowing, McPherson's was unwitting, and that they had not been trained similarly, such that the differential treatment of McPherson was not evidence of pretext. Landry's testimony in this case in no way changes that calculus. Landry did <u>not</u> indicate that McPherson had received formal training in cash-handling procedures, whereas it is undisputed that Page had received such training. Landry's testimony was unequivocal that a person in McPherson's position would receive only on-the-job training, and not formal training, in cash-handling matters. Thus, even taking into account Landry's testimony, there remains a material and significant distinction between McPherson (who had received no formal training and did not even know about the bundle-counting rule) and Page (who had received formal training and was unquestionably aware of that rule) for purposes of their culpability for the December 20 cash shortage.[30] As

do not constitute game-changers that might transform the pretext analyses performed by this Court in *Jackson* and by the Eleventh Circuit in *Jackson II*.

[30] Plaintiff offers a pair of additional arguments on this point. Both are unconvincing. Specifically, plaintiff questions the credibility of McPherson's statement that he did not know about the bundle-counting rule, and suggests that there is a jury issue on that point. But Landry's testimony is that the only training McPherson would have received on cash-handling processes was "on-the-job training." If (as Page's testimony shows) no one in Store #578 was following the bundle-counting rule for years before the December 2006 cash shortage, then how could McPherson have learned about that rule simply from working in the store? Plaintiff does not answer that question, much less present non-speculative evidence that McPherson was ever exposed to the bundle-counting rule at any time in the course of his on-the-job training. No genuine issue of material fact is presented here. Also, plaintiff suggests that McPherson's ignorance of, and lack of training as to, the bundle-counting rule is itself probative of pretext, because it suggests that "Winn-Dixie has a rule that no one follows, and is only now being selectively enforced." (Doc. 59-1, at 6.) There is no evidence of selective enforcement. The record is quite clear that Winn-Dixie disciplined Page and Jackson not merely because they violated a cash-handling policy, but because they violated a cash-handling policy that resulted in a $1,000 loss. Plaintiff has adduced not one scintilla of evidence that Winn-Dixie has ever refrained from taking disciplinary action when violation of cash-handling policies results in a significant financial loss. These circumstances do not support an inference of selective enforcement, much less of pretext. At most, plaintiff is quarreling with the wisdom of Winn-

such, the fact that McPherson was not demoted for violating cash-handling policies does not further plaintiff's contention that Winn-Dixie's stated reason for demoting Page is a pretext for illegal discrimination.

Besides, even if Page were correct that a reasonable jury could find no difference in training between Page and McPherson that could support Winn-Dixie's failure to discipline them identically for the December 20 cash shortage, that would not be sufficient to satisfy plaintiff's pretext burden. In this Circuit, there is a "well-established rule that a plaintiff must show pretext as to each proffered reason." *Chapman*, 229 F.3d at 1037 n.30; *see also Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1309 (11th Cir. 2007) ("By failing to rebut each of the legitimate, nondiscriminatory reasons of the City, Crawford has failed to raise a genuine issue of material fact about whether those reasons were pretext for discrimination."); *Bojd v. Golder Associates, Inc.*, 2006 WL 3780645, *1 (11th Cir. Dec. 26, 2006) ("Where multiple reasons are advanced, the plaintiff must show that each reason was a pretext."). Winn-Dixie's evidence is that it demoted Page and not McPherson because (a) McPherson had not received formal training on cash-handling procedures, while Page had; and (b) oversight of the safe was the primary responsibility of Page, not the manager on duty. So even if Page has effectively rebutted the first reason (which she has not), she still has not shown the second to be pretextual, and therefore cannot withstand summary judgment.

Third, Page contends that the facts in this case are distinguishable from *Jackson* because of Sellers' revelation here that, even though he was on sick leave from October 2006 through April 2007, he was at work every other week as his chemotherapy schedule permitted. Based on this evidence, plaintiff theorizes that "a reasonable jury could conclude that Sellers did in fact work" during the relevant period, "and may have even performed an evening count." (Doc. 59-1, at 7.) This is sheer speculation. It is uncontroverted that Sellers was not at work on either

---

Dixie's human resources and training practices (*i.e.*, whether managers should receive formal training, whether all cash-handling violations should be punished), but this Court cannot and will not sit as a super-personnel department passing judgment on the desirability of Winn-Dixie's protocols in this regard. *See, e.g., Wilson*, 376 F.3d at 1092 ("The role of this Court is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments.") (citation and internal quotation marks omitted).

Wednesday, December 20, 2006 (the day the cash shortage was discovered) or Thursday, December 21, 2006 (the day the Winn-Dixie investigators visited Store #578). There is no evidence placing Sellers in the workplace at any time during the week of the cash shortage's discovery. Plaintiff's own testimony was that the only times she ever counted the safe with Sellers were "before he got sick," and therefore well before the cash shortage. The mere fact that Sellers worked from time to time during his medical leave in no way undermines, belies, or calls into question the veracity of Landry's testimony that he did not hold Sellers primary responsible for the cash shortage because Sellers "was on medical leave" and "was not present in the store when the $1,000 was reported missing." As such, Page has failed to distinguish this case from that of Markele Jackson in a manner that might alter the Eleventh Circuit's determination in *Jackson II* that there is no evidence of pretext.

In light of the foregoing analysis, the Court perceives no legal or factual basis for departing from the *Jackson II* pretext analysis, or for reaching a different outcome in this case. Furthermore, plaintiff's pretext argument fails for the simple reason that her theory of liability both sweeps far too broadly and amounts to little more than a protestation of unfairness. The record in this case is striking for Page's repeated insistence (to Landry, to the EEOC, to her deposition interrogator, etc.) that her demotion was unfair because everyone else at Store #578 was committing the same cash-handling violations that she was, yet only Page and Jackson (both of whom are black) were punished. As an initial matter, fairness has nothing to do with the § 1981 analysis. *See, e.g., Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) ("We are not interested in whether the conclusion is a correct one, but whether it is an honest one. ... We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").

More fundamentally, though, plaintiff's underlying theory is that Page is a victim of race discrimination because white employees who participated in safe counts in the days leading up to the December 20 cash shortage and did not break the bundles were not demoted, but she and Jackson were. But, taking Page's testimony at face value, she and Jackson were not the only African-American employees performing improper safe counts at Store #578 shortly before December 20. For example, plaintiff indicated that Leanda Black or Wanda Lafayette (both of

whom were African-American employees) performed the morning safe count in her absence on December 16, 17 and 18, and that they did so without breaking the bundles. It is uncontroverted that neither Black nor Lafayette was disciplined for creating or not detecting the December 20 cash shortage. If Page's comparators are other Store #578 employees who participated in safe counts in the days before the cash shortage was discovered but were not disciplined, then those comparators necessarily include both black and white employees. She cannot pick and choose the white violators treated differently than she was, but ignore the black violators treated differently than she was, to make out a case of race discrimination. Yet that is precisely what Page seeks to achieve. Ultimately, then, Page's beef with Winn-Dixie is not that she was treated differently than white employees, but that she was treated differently than other employees, some of whom were white and some of whom were black. The record unambiguously establishes that, to the extent Page was treated differently than others for her violation of Winn-Dixie's cash-handling policies, that difference could not have been predicated on her race, even under Page's professed theory of liability.

For all of these reasons, the Court finds that Page has failed to meet her burden of showing that Winn-Dixie's stated reason for transferring and demoting her was false, or that the true reason was racially discriminatory. As such, Winn-Dixie is entitled to summary judgment on plaintiff's § 1981 race discrimination cause of action.

C.      *Retaliation Claim against Winn-Dixie.*

Plaintiff also brings a retaliation claim against Winn-Dixie. According to the Complaint, Page maintains that her demotion and transfer constituted unlawful retaliation, in violation of 42 U.S.C. § 1981, because they were prompted by "her participation in the investigation of racial misconduct on the job by defendant Sellers for bringing a hangmen [*sic*] noose to work and using racial slurs in the store." (Doc. 1, ¶ 12.) Winn-Dixie seeks entry of summary judgment in its favor on this cause of action.

To establish a *prima facie* case of retaliation, Page must show that "(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse employment action; and (3) [s]he established a causal link between the protected activity and the adverse action." *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009); *see also Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section

1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.") (citation omitted). Winn-Dixie argues that Page has failed to satisfy the first element.

"To state a retaliation claim under § 1981, a plaintiff must allege a defendant retaliated against him because the plaintiff engaged in statutorily protected activity. ... As with other statutory retaliation claims, such a claim under § 1981 requires that the protected activity involve the assertion of rights encompassed by the statute." *Jiminez v. Wellstar Health System*, --- F.3d ----, 2010 WL 550827, *4 (11th Cir. Feb. 18, 2010) (citations omitted). In the § 1981 context, "[s]tatutorily protected expression includes complaining to superiors about harassment in the work place, lodging complaints with the EEOC and participating in discrimination-based lawsuits." *DeLeon v. ST Mobile Aerospace Engineering, Inc.*, --- F. Supp.2d ----, 2010 WL 500446, *18 (S.D. Ala. Feb. 9, 2010).

Winn-Dixie contends that Page did not engage in any protected activity prior to the January 2007 demotion and transfer. There is no evidence that she had ever filed an EEOC charge against Winn-Dixie prior to that personnel action, that she had ever complained to anyone at Winn-Dixie about racially discriminatory treatment, or that she had ever participated in a discrimination-based lawsuit against Winn-Dixie. To be sure, Page alleges in her Complaint that she was disciplined for her "participation in the investigation of racial misconduct" against Sellers based on complaints that he had brought a hangman's noose to work and engaged in racial slurs. But plaintiff's testimony negates this avenue of protected activity. Indeed, Page admitted that she "never participated in an investigation" about a noose or racial slurs. (Page Dep., at 217.) Her testimony is crystal clear on this point. (*Id.* at 170.) According to Page, she has never heard any manager make racial slurs and has never seen a noose at Winn-Dixie. (*Id.* at 163.) And she never told Landry or Sellers that she believed she was being singled out because of a complaint about racial discrimination. (*Id.* at 239.) So where is the protected activity? Although Winn-Dixie raises this issue on summary judgment, plaintiff neglects to respond.[31]

---

[31]     To be sure, plaintiff devoted approximately four pages of her opposition brief to the retaliation cause of action, but she chose not to address Winn-Dixie's contention that she did not participate in protected activity. At most, Page states that (a) "an employee" complained in the summer or fall of 1996 that Sellers had made racially discriminatory comments and brought a

The Court is thus left with no evidence (or even argument) by plaintiff on summary judgment that she ever engaged in statutorily protected activity (*i.e.*, that she ever took any action to oppose race discrimination) for § 1981 retaliation purposes. In light of this glaring omission, Page has failed to establish a *prima facie* case of retaliation under § 1981 and, consequently, Winn-Dixie's motion for summary judgment will be granted as to that claim.

### D. Claims against Brent Sellers.

Lastly, defendant Sellers seeks summary judgment on Page's § 1981 race discrimination brought against him individually. The Complaint casts Sellers as the villain in plaintiff's demotion and transfer. In particular, Page alleges that he "set out to discriminate and retaliate against the plaintiff after she participated in an investigation of Sellers relating to his bringing a noose to work and the use of racial slurs on the job." (Doc. 1, ¶ 3.) Of course, this theory is predicated on Page's participation in an investigation of Sellers, but the record squarely refutes the notion that any such participation ever took place.

Unlike a Title VII claim, a § 1981 claim may be brought against an individual supervisor. *See, e.g., Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1176 (11th Cir. 2003) (noting that § 1981 "provide[s] for individual liability"); *Moss v. W & A Cleaners*, 111 F. Supp.2d 1181, 1187 (M.D. Ala. 2000) ("Contrary to Title VII, individual employees can be held liable for discrimination under § 1981.") (citation and internal quotation marks omitted). Federal courts have held that a claim for individual liability under § 1981 requires an affirmative showing linking the individual defendant with the discriminatory action. *See Schanfield v. Sojitz Corp. of America*, 663 F. Supp.2d 305, 344 (S.D.N.Y. 2009) (for personal liability to attach under § 1981, "[i]t must be shown that the defendant has personal involvement in the allegedly discriminatory conduct"); *Wallace v. DM Customs, Inc.*, 2006 WL 2882715, *7 (M.D. Fla. Oct. 6, 2006) ("To establish a claim for individual liability under § 1981, a plaintiff must demonstrate some

---

noose to work, and (b) Jackson (not Page) participated in the investigation of this anonymous complaint. Plaintiff leaves unanswered the question of how she can bring a § 1981 retaliation claim predicated on protected activity undertaken by someone else. She offers no legal support for the proposition that a retaliation plaintiff can "take credit" for protected activity in which another employee engaged, in the absence of personal participation in or ratification of that protected activity by the plaintiff herself.

affirmative link to causally connect the actor with the discriminatory action [and] ... [t]he claim must be predicated on the actor's personal involvement.") (citations and internal quotation marks omitted). Plaintiff presents no argument that her § 1981 claims against Sellers can survive summary judgment. As discussed *supra*, Page has failed to come forward with sufficient evidence to create a triable issue as to whether she was subjected to racially discriminatory treatment at all; therefore, her § 1981 race discrimination claims against Sellers fail for the same reasons that her claims against Winn-Dixie do.[32] There is simply no jury question presented on plaintiff's theory that her January 2007 transfer and demotion was animated by unlawful race discrimination by anyone.

**V.     Conclusion.**

For all of the foregoing reasons, Defendants' Joint Motion for Summary Judgment (doc. 45) is **granted** and Plaintiff's Motion for Partial Summary Judgment (doc. 47) is **denied**. Accordingly, this action is **dismissed with prejudice**. A separate judgment will enter.


DONE and ORDERED this 18th day of March, 2010.


s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[32]     In so concluding, the Court does not embrace Sellers' reasoning that he is entitled to summary judgment because he was not the decision-maker for the challenged personnel action. There is authority for the proposition that the "personal involvement" requirement "may be satisfied by proof that the individual had knowledge of the alleged acts of discrimination and failed to remedy or prevent them." *Wallace*, 2006 WL 2882715, at *7. Sellers' acts of sitting idly by and failing to speak out to corroborate Page's remarks about the scope of the cash-handling violations at Store #578 while Landry demoted Page could arguably satisfy this criterion and support individual liability, if in fact there was evidence that the demotion itself was racially discriminatory. In the absence of such evidence, however, Page's § 1981 claim against Sellers is not cognizable.